Filed 5/31/22 (mod.); pub. order 6/1/22 follows unmodified opinion (attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF OAKLAND et al., | C090832 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2018-80003024-CU-WM-GDS) |
| v. | |
| DEPARTMENT OF FINANCE et al., | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on May 6, 2022, be modified as follows:

1.     On page 2, in the second sentence of the first full paragraph ending with the words "by resolution of the Successor Agency," the words "oversight board" are inserted after the word "Agency."  As modified this sentence now reads:

> The first involves item 426 in which a loan between the City of Oakland (City) and its former RDA to fund the West Oakland Projects Initiative was reinstated by resolution of the Successor Agency oversight board.

1

2. On page 3, in the third sentence of the first full paragraph, containing the words "Successor Agency's passage of a resolution," the word "Agency's" is deleted and the words "Agency oversight board's" are inserted in its place. As modified this sentence now reads:

> Nothing in the Dissolution Law prevented DOF from reviewing the purported loan on appellants' 2016-2017 ROPS just because DOF declined to previously review the Successor Agency oversight board's passage of a resolution purporting to reinstate the "loan."

3. On page 20, at the end of the last paragraph of part II, C., after the sentence ending "within the meaning of the Dissolution Law," add as footnote 4 the following footnote, which will require renumber of all subsequent footnotes:

> This conclusion also requires rejection of the City's argument that section 34191.4, subdivision (d) prohibited DOF from denying the loan obligation after the Oversight Board issued the Resolution reinstating the loan. For reasons already expressed, the Resolution did not reinstate a loan at all.

There is no change in the judgment. Appellant's petition for rehearing is denied.


FOR THE COURT:


 /s/
HULL, Acting P. J.



 /s/
HOCH, J.



 /s/
KRAUSE, J.


2

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF OAKLAND et al., | C090832 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2018-80003024-CU-WM-GDS) |
| v. | |
| DEPARTMENT OF FINANCE et al., | |
| Defendants and Respondents. | |

More than a decade after California dissolved its redevelopment agencies (RDA's), we continue to grapple with questions regarding the former RDA's continuing obligations. (*Cuenca v. Cohen* (2017) 8 Cal.App.5th 200, 207 (*Cuenca*); *County of Sonoma v. Cohen* (2015) 235 Cal.App.4th 42, 44.) In dissolving the RDA's, the Legislature recognized that some agreements and loans made in connection with redevelopment projects would require continued funding. (*Cuenca,* at p. 207; Health & Saf. Code, § 34191.4, subd. (b)(2)(C)(i).)[1] As part of the Dissolution Law, the

---

[1] Undesignated statutory references are to the Health and Safety Code. We refer to the panoply of statutes in the Health and Safety Code that govern payment of enforceable obligations incurred by the now-dissolved RDA's as the Dissolution Law.

Legislature specified that enforceable obligations may be paid only under the oversight of the Department of Finance (DOF) and State Controller. (*City of Emeryville v. Cohen* (2015) 233 Cal.App.4th 293, 298-299 (*City of Emeryville*).) As relevant to this case, the primary manner in which DOF exercises its continuing oversight of payment of enforceable obligations of the former RDA's is by review of the recognized obligation payment schedule (ROPS).

This appeal focuses on two items that DOF rejected in reviewing ROPS submitted by the Successor Agency to the Oakland Redevelopment Agency (Successor Agency). The first involves item 426 in which a loan between the City of Oakland (City) and its former RDA to fund the West Oakland Projects Initiative was reinstated by resolution of the Successor Agency. The second was item 370, which relates to staffing costs required to ensure completion of several housing projects. After unsuccessful meet and confer efforts with DOF, the City and the Successor Agency sought a writ of traditional mandate in superior court to compel DOF to pay various ROPS items denied by DOF. The trial court heard the matter and issued a ruling agreeing with DOF's conclusion that none of the items for which the City and Successor Agency sought approval were enforceable obligations. The City and the Successor Agency timely appealed from the judgment.[2]

On appeal, appellants limit their focus to the denials of ROPS items 370 and 426. Appellants contend (1) the loan between the City and the Successor Agency relating to the West Oakland Projects Initiative constitutes an enforceable obligation under the Dissolution Law, (2) DOF lacked authority to deny funding for the West Oakland Projects Initiative on a ROPS after DOF approved the loan as an enforceable obligation, and (3) staffing costs required while the Successor Agency ensures completion of

---

[2]     Defendants in the trial court were DOF and then-director of DOF, Michael Cohen. On appeal, the Attorney General appears to have filed briefing only on behalf of DOF.

construction for various housing assets continue to be enforceable obligations of the Successor Agency.

We conclude that neither the cooperation agreement nor the funding agreement on which appellants rely constitute a loan that can be considered an enforceable obligation under the Dissolution Law. Whether considered singly or together, the cooperation and funding agreements lack the hallmarks of an actual loan but rather represent agreements to agree. Nothing in the Dissolution Law prevented DOF from reviewing the purported loan on appellants' 2016-2017 ROPS just because DOF declined to previously review the Successor Agency's passage of a resolution purporting to reinstate the "loan." As to such staffing costs, we conclude that under the Dissolution Law, the transfer of housing assets to the City meant that all related obligations also passed to the City. Thus, the Successor Agency could no longer claim staffing costs as an enforceable obligation. Accordingly, we affirm.

## BACKGROUND

### *Dissolution of California's Redevelopment Agencies*

This court has previously explained that "[i]n the midst of California's fiscal emergency in 2011, the Legislature enacted two measures that implemented the dissolution of the roughly 400 redevelopment agencies then in existence. (Assem. Bill [No.] 26 [(2011-2012 1st Ex. Sess.) enacted by Stats. 2011, 1st Ex. Sess. 2011-2012, chs. 5-6 (Assembly Bill 1X 26)] & Assem. Bill No. 27 (2011-2012 1st Ex. Sess.) enacted by Stats. 2011, 1st Ex. Sess. 2011-2012, chs. 5-6 (Assembly Bill 1X 27); see generally [*California Redevelopment Assn. v. Matosantos* (2011)] 53 Cal.4th [231,] 241, 245-246 [(*Matosantos I*)].) Assembly Bill 1X 26 required the redevelopment agencies to conclude their activities and dissolve. (*Matosantos I,* at p. 241.) Although Assembly Bill 1X 27 would have allowed redevelopment agencies to continue if they paid into funds benefitting schools and special districts, the California Supreme Court struck down this alternative as conflicting with the California Constitution's prohibition on requiring such

3

payments.  (*Matosantos I*, at p. 242; Cal. Const., art. XIII, § 25.5.)  After *Matosantos I*, redevelopment agencies had no option but to wind down and dissolve.  (*City of Emeryville, supra*, 233 Cal.App.4th at p. 298.)

"Winding down California's redevelopment agencies and their projects proved to be no simple task.  A year after enacting Assembly Bill 1X 26, the Legislature passed Assembly Bill [No.] 1484 [(2011-2012 Reg. Sess.)] to clarify and tighten restrictions on the funds from redevelopment projects.  (Stats. 2012, ch. 26, §§ 6-35.)  In addition to winding down the redevelopment agencies, the Legislature also eliminated the tax increment.  Subdivision (a) of section 34189 provides in pertinent part:  'all provisions of the Community Redevelopment Law that depend on the allocation of tax increment to redevelopment agencies, including, but not limited to, Sections 33445, 33640, 33641, and 33645, and subdivision (b) of Section 33670, shall be inoperative.'

"Although the Legislature eliminated California's redevelopment agencies, it provided for the continuing validity of enforceable obligations previously created by the redevelopment agencies.  . . .  (§ 34171, subd. (d)(1)(D).)  To ensure that claimed enforceable obligations met the criteria set forth in the Dissolution Law, the Legislature provided that '[e]ach oversight board . . . has a fiduciary duty towards "holders of enforceable obligations and the taxing entities that benefit from distributions of property tax" (§ 34179, subd. (i)) to carry out its duties, which include the duty to review specified actions by the successor agencies, including "[e]stablishment of the Recognized Obligation Payment Schedule."  (§ 34180, subd. (g).)  The recognized obligation payment schedule (ROPS) is "the document setting forth the minimum payment amounts and due dates of payments required by enforceable obligations for each six-month fiscal period . . . ."  (§ 34171, subd. (h).)  The successor agency has a duty to "[c]ontinue to make payments due for enforceable obligations."  (§ 34177, subd. (a).)  Thus, to help ensure the orderly windup and dissolution of the redevelopment agencies, the ROPS lists what remaining enforceable obligations exist.

4

" 'To ensure each ROPS is accurate, both the [DOF] and the . . . State Controller . . . have the authority to require documentation of purported enforceable obligations, and they and any "taxing entity" have authority to sue "to prevent a violation under this part . . . ." (§ 34177, subd. (a)(2).) The [DOF] also has authority to "review an oversight board action taken pursuant to" Assembly Bill 1X 26. (§ 34179, subd. (h).)' (*City of Emeryville, supra,* 233 Cal.App.4th at pp. 298-299.)

"Under the Dissolution Law, successor agencies could either retain responsibility for the 'housing functions' previously performed by the redevelopment agencies, or transfer the responsibility to a ' "housing successor." ' (§ 34176, subd. (a)(1) & (3).) If a successor agency transferred responsibility to a housing successor, the housing successor assumed 'all rights, powers, duties, obligations, and housing assets,' except for 'any amounts on deposit in the [Housing Fund] and enforceable obligations retained by the successor agency.' (*Id.*, subd. (a)(1).) DOF is charged with responsibility to review whether a 'transferred asset is deemed not to be a housing asset,' in which case it must be returned for allocation to the taxing entities. (*Id.*, subd. (a)(2).)

"Under section 34177, 'Successor agencies are required to [¶] . . . [¶] (d) Remit unencumbered balances of redevelopment agency funds to the county auditor-controller for distribution to the taxing entities, including, but not limited to, the unencumbered balance of the [Housing Fund] of a former redevelopment agency.' The Dissolution Law requires successor agencies to retain licensed accountants 'to conduct a due diligence review to determine the unobligated balances available for transfer to taxing entities' that are (1) held in the Housing Fund, and (2) former redevelopment agency assets held by the successor agency in any other form or fund. (§ 34179.5, subds. (a), (c)(1)-(5).) The successor agency must review and approve each due diligence review, followed by review and approval by DOF. (§ 34179.6.) Under section 34179.6, DOF has the prerogative to adjust the amounts deemed unencumbered. (§ 34179.6, subds. (c) & (d).) The successor agencies then remit the unencumbered moneys to the county auditor-

5

controller, who transfers the moneys to the taxing entities. (§ 34179.6, subd. (f).)" (*Cuenca*, *supra*, 8 Cal.App.5th at pp. 210-212.)

### *West Oakland Projects Initiative Loan (Item 426)*

As pertinent to the West Oakland Projects Initiative, the City committed $2.69 million in funds to its former RDA under a 2004 cooperation agreement that was confirmed in a 2011 funding agreement to pay third parties for construction of redevelopment infrastructure projects in West Oakland. The City self-financed the infrastructure costs from its general purpose funds with the understanding its RDA would use redevelopment funds to reimburse the City for its costs. Projects planned under the West Oakland Projects Initiative included a teen center, a streetscape project, as well as additional capital improvements aimed at existing physical blight.

The Dissolution Law originally "provided (with exceptions) that agreements between a City and its RDA are not enforceable. ([§ 34171, subd. (d)(2);] [a]dded by Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 5, § 7.) Assembly Bill No. 1484 (2011-2012 Reg. Sess.) did not change section 34171, subdivision (d)(2) in any way. But it did add section 34179.5, which in part provided for the [due diligence review], and section 34179.6, which described the procedures following such review. (See Stats. 2012, ch. 26, §§ 17-18.) [¶] Section 34179.5, subdivision (b)(2) provides in part: ' "Enforceable obligation" includes any of the items listed in subdivision (d) of Section 34171 [and] contracts detailing specific work to be performed that were entered into by the former [RDA] prior to June 28, 2011, with a third party that is *other than the city* . . . that created the former [RDA.]' (Italics added; see Stats. 2012, ch. 26, § 17.)" (*City of Grass Valley v. Cohen* (2017) 17 Cal.App.5th 567, 585 (*Grass Valley*); see *City of Brentwood v. Campbell* (2015) 237 Cal.App.4th 488, 495 (*Brentwood I*).)

In September 2015, the Legislature amended the Dissolution Law to allow for reinstatement of *some* agreements between cities and their former RDA's. (§ 34191.4, subd. (b)(1)-(2).) "Under section 34191.4, subdivision (b)(1), 'loan agreements' between

6

an RDA and city 'shall be deemed to be enforceable obligations provided that the oversight board makes a finding that the loan was for legitimate redevelopment purposes.' . . . [¶] However, 'loan agreement' is defined by this section to include '[a]n agreement between the former redevelopment agency and the city . . . *under* which the city . . . contracted with a third party on behalf of the former redevelopment agency for the development of infrastructure in connection with a redevelopment project as identified in a redevelopment project plan and the former redevelopment agency was obligated to reimburse the city . . . for the payments made by the city . . . to the third party.' (§ 34191.4, subd. (b)(2)(C)(i), italics added.)" (*City of Brentwood v. Department of Finance* (2020) 54 Cal.App.5th 418, 429 (*Brentwood II*).) Section 34191's provision that allowed reinstatement of city/former RDA agreements was made retroactive to "actions occurring on or after June 28, 2011." (§ 34191.4, subd. (d).)

As pertinent to this appeal, the City and its RDA entered into a funding agreement relating to various redevelopment projects – including West Oakland redevelopment projects – on March 3, 2011. An exhibit to the funding agreement listed more than 200 RDA projects totaling more than half a billion dollars.

In July 2013, the Successor Agency's oversight board made a finding that the loan between the City and its former RDA for the West Oakland Projects Initiative totaled $2.69 million and was for legitimate redevelopment purposes "to alleviate physical and economic blight conditions in the West Oakland Redevelopment Project Area." In support of the finding, the Successor Agency's oversight board received a staff report that detailed the projects encompassed within the West Oakland Projects Initiative.

The Successor Agency found that the loan constituted an enforceable obligation of the Successor Agency to the City and that terms of the loan conformed with section 34194.4, subdivision (b). Based on these findings, the Successor Agency oversight board passed resolution No. 2013-16 (Resolution) to recognize the loan indebtedness of the Successor Agency as an enforceable obligation under section 34194.4, subdivision (b).

7

In pertinent part, the Resolution stated that "redevelopment funds totaling $2.69 million were committed by the former Redevelopment Agency, starting in 2008, to pay for certain public improvements and grants to private entities in the West Oakland Redevelopment Project Area, as more particularly set forth in the staff report accompanying this Resolution, via a Cooperation Agreement entered into between the City of Oakland and the Redevelopment Agency in 2004 and a Funding Agreement between the City and the Redevelopment Agency entered into in 2011 . . . ."

The staff report recommending the adoption of the Resolution enumerated the projects comprising the $2.69 million indebtedness to be deemed an enforceable obligation under the Dissolution Law. None of the third party contracts predated the 2004 cooperation agreement. Two third party contracts predated the 2011 funding agreement, but the remaining 15 third party contracts postdated both the cooperation agreement and the funding agreement.

On July 30, 2013, the Successor Agency transmitted the Resolution to DOF along with a description of the loan. The Successor Agency noted that "[t]his loan originated in 2008 and is payable over a three-year period commencing in 2014." The information transmitted to DOF also included a repayment schedule and explanation for the method of repayment if the amount of real property tax trust funds available were insufficient to make full payment.

On August 1, 2013, DOF acknowledged receipt of the Resolution and informed the Successor Agency: "Pursuant to [section] 34179[, subdivision ](h) the Department of Finance (Finance) may request a review of Oversight Board actions submitted to Finance. This email serves as notice that Finance is not initiating a review of . . . Resolution No. 2013-016. [¶] However, the repayments of this loan is subject to Finance's review and approval on a subsequent Recognized Obligation Payment Schedule before they can be considered enforceable."

8

In September 2013, the City submitted a ROPS for 2013 to the first half of 2014. After a meet and confer, DOF denied item 426 – relating to repayment of the West Oakland Projects Initiative loan under the Resolution. DOF acknowledged that "the Agency may place loan agreements between the former redevelopment agency and sponsoring entity on the ROPS as an enforceable obligation, provided the oversight board makes a finding that the loan was for legitimate redevelopment purposes pursuant to [section] 34191.4[, subdivision ](b) (1)." However, DOF denied payment of the loan under the Resolution because the Dissolution Law "specifie[d] loan or deferral repayments shall not be made prior to the 2013-14 fiscal year." Thus, DOF advised that "the Agency must wait until the ROPS residual pass-through distributions are known for fiscal year 2013-14 before requesting funding for this obligation. Therefore, this item is not eligible for funding *at this time*." (Italics added.)

The Successor Agency determined that the tax increment was sufficient and requested repayment of the loan as item 426 on ROPS for the fiscal year 2016 to 2017. In May 2016, DOF denied payment of item 426. DOF reasoned that the RDA had lacked power to create any obligation after June 27, 2011, and the item related to contracts entered after that date. DOF stated: "During the Meet and Confer process, the Agency provided a summary of actual expenditures. The summary shows that expenditures incurred by the City started in fiscal year 2011-12, which were in accordance with the list of projects in the First Amendment to Funding Agreement dated March 25, 2011, between the City and the former RDA. Additionally, documents provided by the Agency indicated that contracts entered into by the City were after June 27, 2011. As such, the outstanding balance as of June 27, 2011, was $0 for the loan agreement approved by the Oversight Board (OB) in OB Resolution 2013-16."

### Successor Agency Staffing Costs (Item 370)

The Successor Agency transferred housing assets to the City that were listed on a housing assets transform form that was – in the portion pertinent to this appeal –

9

approved by DOF. Although the housing *assets* were transferred to the City, the Successor Agency retained various housing *obligations* related to approximately six loan agreements related to uncompleted housing projects. These loan agreements are for the 1574-1590 7th Street affordable housing site; 3701 Martin Luther King, Jr., Way affordable housing site; 3829 Martin Luther King, Jr., Way affordable housing site; 715 Campbell Street affordable housing site; 1672 7th Street affordable housing site; and 1666 7th Street affordable housing site. These contractual obligations required the Successor Agency to submit a predevelopment schedule; secure all necessary financial commitments; satisfy all bond and insurance requirements; obtain all necessary permits, licenses, and environmental reviews; and diligently pursue construction under the City issued occupancy certificates for the project.

Based on the Successor Agency's obligations to complete the housing projects, it sought funding for staff costs. It appears that DOF approved these staffing costs on ROPS I and II. It then appears that DOF rejected the staffing costs in ROPS III. In a meet and confer process, the Successor Agency explained that the Dissolution Law "provides that the cost of employees performing direct project management work on enforceable obligations are considered part of the cost of those obligations, and are not administrative expenses." DOF was persuaded and noted that "the Agency provided a breakdown of staff costs incurred during the ROPS III period for each position by task for each project. The ROPS III staff costs totaled $849,314 and the Agency estimates the ROPS 13-14A staff costs will be $870,142. Therefore, Finance is approving Item 370 in the amounts of $849,314 and $870,142 for ROPS III and ROPS 13-14A, respectively."

10

DOF continued to approve item 370 on subsequent ROPS.  However, in May 2016, DOF denied payment of item 370.**³**  DOF reasoned:  "It is our understanding these costs are related to housing obligations approved for transfer on the Housing Asset Transfer (HAT) form (i.e., real property, encumbrances, and/or loan receivables) to the Housing Successor Entity.  Pursuant to [Health and Safety Code] section 34176[, subdivision] (a)(1), the Agency may retain enforceable obligations related to housing assets transferred to the Housing Successor Entity.  However, there are no contractual agreements obligating the Agency to perform project management on these housing assets.  Therefore, because the housing assets have been transferred, related project management costs are the obligation of the Housing Successor Entity, not the Agency."

### *Petition for Writ of Mandate*

In December 2018, the City filed a petition for writ of mandate to compel DOF to reverse its denials of several ROPS items.  DOF filed opposition.  The trial court heard the matter and denied the petition.

Regarding item 426, the trial court rejected the loan between the City and the Successor Agency as an enforceable obligation.  The trial court noted the 2004 cooperation agreement but concluded that, "[s]ubject to caveats, the Cooperation Agreement required [the redevelopment agency] to repay the City, but not on any specific timeline.  The Cooperation Agreement did not obligate the City to fund or assist with any specific project."  As to the 2011 funding agreement, the trial court found that "[t]he Funding Agreement incorporated the Cooperation Agreement by reference and authorized the City to carry out numerous redevelopment projects subject to [the RDA's] reimbursement of costs incurred.  [The RDA] was specifically required to 'advance' $258

---

**³**     In reporting the results of its review of the 2016-2017 ROPS, DOF denied and reduced several items on the ROPS.  At this point, however, only items 370 and 426 remain in contention.  We limit our review to these two items.

11

million by June 30, 2011 'to partially fund the Projects.' To the extent additional funding might be required in the future, [the RDA] would provide it from its available tax revenues, but not on any . . . timeline. The City was required to provide [the RDA] with quarterly reports of progress made on the projects, and [the RDA] would make additional payments 'upon the request of the City or as scheduled by the City, and as otherwise necessary[.]' The City did not contract with any third parties to begin construction until after [Assembly Bill No. IX] 26 [(2011-2012 1st Ex. Sess.)] went into effect. Nonetheless, by January 2012, the City had incurred the $2.69 million pursuant to third-party construction contracts."

The trial court rejected the proposition that the loan in item 426 constituted an enforceable obligation because, under the "definitions in [section] 34191.4[, subdivision ](b)(2), neither the Cooperation Agreement nor the Funding Agreement qualifies as a loan. Neither conforms to subd[ivision] (b)(2)(A) because neither agreement involved a transfer of money to [the RDA]. The Cooperation Agreement provided a framework under which the City could assist [the RDA] with redevelopment, but it did not effectuate any concrete transaction. Moreover, the only transfer specifically required under the Funding Agreement was the $258 million transfer from [the RDA] to the City. Additionally, the agreements do not conform to subd[ivision] (b)(2)(A) because neither contains a 'required payment schedule.' [The Successor Agency] purported to impose a repayment schedule when it passed . . . Resolution 2013-016. But [section] 34191.4[, subdivision ](b)(2)(A) describes loans with repayment schedules, not resolutions with such schedules." The trial court further reasoned, "Nor do the Cooperation Agreement and Funding Agreement constitute a loan under subd[ivision] (b)(2)(C). That subdivision defines loan as a sponsor agreement 'under which the [sponsor] city . . . contracted with a third party on behalf of the former . . . [RDA] . . . for the development of infrastructure.' "

12

As to staffing costs, the trial court determined that the item could not be considered an enforceable obligation. The trial court reasoned, "Enforceable obligations under [section] 34171[, subdivision ](d) are limited to RDA['s] former obligations, not their sponsor entities' obligations. (See *Cuenca v. Cohen* (2017) 8 Cal.App.5th 200, 211.) Whether or not redevelopment employees since 1983 have continued to receive the same pension benefits as those provided under the earlier contract between [the RDA] and CalPERS, only the City has been contractually obligated to fund redevelopment employees' pensions for the past 36 years. Moreover, only the City is a 'contracting agency' under the California Public Employees' Retirement Law. (See Gov[.] Code[,] §§ 20022, 20460, 20532, 20806.) As a result, only the City has 'legally enforceable' payment obligations in connection with redevelopment employees' pensions. (See . . . § 34171[, subdivision ](d)(1)(C).) Thus, DOF was not required to treat the City's pension obligations as [the Successor Agency's] enforceable obligations." (Fn. omitted.)

The trial court denied the writ petition and entered a judgment in favor of DOF. The City and the Successor Agency timely filed a notice of appeal.

## DISCUSSION

### I
### *Principles of Review*

In this case, we are presented with questions of statutory interpretation under the Dissolution Law. "The fundamental objective of statutory interpretation is to determine the Legislature's intent." (*County of San Bernardino v. Cohen* (2015) 242 Cal.App.4th 803, 816.) " ' "[W]here the issue is one of statutory construction or contract interpretation, and the evidence is not in dispute, the de novo standard of review applies [citation]." ' (*City of Petaluma v. Cohen* (2015) 238 Cal.App.4th 1430, 1438-1439; see *People v. International Fidelity Ins. Co.* (2010) 185 Cal.App.4th 1391, 1395.) Writ of mandate ordinarily reviews administrative actions for abuse of discretion, but [w]here the question is whether the Department correctly interpreted the statute and the relevant

13

agreements, which is subject to de novo review without according deference to the Department. ([*City of*] *Tracy*[*v. Cohen* (2016)] 3 Cal.App.5th [852,] 860; but see *Brentwood I, supra*, 237 Cal.App.4th at p. 500 [interpretation is ultimately de novo but ' " ' "weak deference" ' " ' is accorded to agency's interpretation of its governing statutes where its expertise gives it superior qualifications to do so].)" (*Brentwood II, supra,* 54 Cal.App.5th at p. 428.)

In reviewing the purported loan agreement for the West Oakland Projects Initiative, we apply well-settled principles of contract interpretation. " 'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638.)" ' " (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470, quoting *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18.)

## II
### *West Oakland Projects Initiative Financing (Item 426)*

Appellants argue that DOF erroneously denied item 426 on the ROPS because that item constituted an enforceable obligation in the form of a valid loan agreement between the City and its former RDA. As part of its argument, appellants assert that DOF's failure to review the Resolution when first presented with the Successor Agency's action effectively insulated the loan from subsequent ROPS reviews. We are not persuaded.

14

## A.
### *The Cooperation and Funding Agreements*

Appellants argue that we should read the 2004 cooperation agreement and the 2011 funding agreement together as comprising the loan it believes to be an enforceable obligation under the Dissolution Law.

In July 2004, the City and its RDA entered into a "Cooperation Agreement" in which the City agreed to provide the following to its RDA: administrative and staffing assistance, advances and transfers necessary to fund the RDA, and accounting services. In return, the RDA promised to reimburse the City for "all costs incurred for services rendered and payments made by the City" under the cooperation agreement. The cooperation agreement stated no schedule for repayment, no interest rate, and no minimum payment for any installment. Instead, the cooperation agreement subordinated possible repayment to "any Agency pledge of tax increment revenues for tax allocation bonds or other long-term indebtedness of the Agency incurred to carry out a redevelopment project." The cooperation agreement specifies no penalty for nonrepayment by the RDA.

On March 3, 2011, the City and its RDA entered into a funding agreement relating to various redevelopment projects – including West Oakland redevelopment projects. As part of the funding agreement, the City agreed to assume responsibility for "all development and construction costs in connection with the Projects, including administration . . . ." The funding agreement required the RDA "to make an advance lump sum payment to the City in the amount of $258,000,000, no later than June 30, 2011, to partially fund the Projects" listed in the agreement's exhibit.[4] However, an

---

[4]    Our review of the administrative record does not indicate that the RDA transferred $258 million – or any fraction thereof – to the City under the funding agreement. Moreover, the City's appellate brief makes no assertion that the RDA transferred any funds as required by the funding agreement.

15

exhibit to the funding agreement listed *budgets* for more than 200 RDA projects totaling more than half a billion dollars.  In listing budgets, the exhibit to the funding agreement did not identify any third parties who would carry out the projects.

The funding agreement further specified:  "All payments due to be made by the Agency to the City under this Agreement shall be made by the Agency upon request of the City or as scheduled by the City, and as otherwise necessary to reimburse the City for the cost to the City of performing its obligations hereunder.  The City shall provide the Agency with a quarterly report accompanied by evidence reasonably satisfactory to the Agency Administrator that the City has progressed in the development and construction of the Project for which payment is made by the Agency commensurate with such payments and has incurred costs or obligations to make payments equal to or greater than such amount."

The only repayment schedule for the purported loan involving the West Oakland Projects Initiative can be found in the staff report for the Resolution and the exhibit attached to the Resolution.  These "loan" repayment terms were based on statutory requirements for loans repayments in the Dissolution Law that were enacted after the cooperation and funding agreements.  (See § 34191.4, subd. (b)(3).)  The staff report stated, "Adoption of this [resolution] will approve the West Oakland loan, as well as its repayment terms and schedule.  Under the loan repayment schedule, funds will be repaid to the City totaling $2.69 million over a scheduled term of three years with interest, of which 20 percent – or $537,907, plus interest – will be set aside for affordable housing."

After June 28, 2011, the City entered into more than a dozen contracts with third parties totaling more than $800,000 to advance the West Oakland Projects Initiative.  To this amount, the City added loans made in 2008 and 2010.  Thus, the City calculated the sum total for the West Oakland Projects Initiative as $2,689,534.51.

16

**B.**
*City-agency Loans as Enforceable Agreements*

Under the Dissolution Law, a loan between the City and its former RDA may become an enforceable obligation when the successor agency reinstates the loan. To this end, section 34191.4, subdivision (b) provides that – with exception not applicable here – that "upon application by the successor agency and approval by the oversight board, loan agreements entered into between the redevelopment agency and the city, county, or city and county that created the redevelopment agency shall be deemed to be enforceable obligations provided that the oversight board makes a finding that the loan was for legitimate redevelopment purposes." Subdivision (b)(2)(C)(i) provides that " 'loan agreement' " (§ 34191.4, subd. (b)(2)) includes "[a]n agreement between the former redevelopment agency and the city, county, or city and county that created the former redevelopment agency under which the city, county, or city and county that created the former redevelopment agency contracted with a third party on behalf of the former redevelopment agency for the development of infrastructure in connection with a redevelopment project as identified in a redevelopment project plan and the former redevelopment agency was obligated to reimburse the city, county, or city and county that created the former redevelopment agency for the payments made by the city, county, or city and county to the third party." (§ 34191.4, subd. (b)(2)(C)(i).)

As this court recently summarized, "Under section 34171, subdivision (d)(2), a reimbursement agreement between a city and a former RDA would not be an enforceable obligation. The amendment created an exception for a 'loan agreement' (§ 34191.4, subd. (b)(2)), defined to include an agreement 'under' which the city 'contracted with a third party on behalf of the former redevelopment agency for the development of infrastructure' and 'the former redevelopment agency was obligated to reimburse the city . . . for the payments made by the city . . . to the third party.' (§ 34191.4, subd. (b)(2)(C)(i).)" (*Brentwood II, supra*, 54 Cal.App.5th at p. 422.)

17

Even while providing for the reinstatement of some loans, section 34191.4 does not define the term "loan." This court, however, has addressed the definition of "loan" under the Dissolution Law in *Grass Valley*, *supra*, 17 Cal.App.5th 567. *Grass Valley*, as in this case, involved a " 'Cooperation Agreement' " between the City of Grass Valley and its former RDA that predated the Dissolution Law. (*Id.* at p. 575.) The City of Grass Valley's cooperation agreement "explained how the two entities would interact, but contained no substantive terms, that is . . . no specific loans or services were identified." (*Ibid.*) As this Court explained in *Grass Valley*, " 'Typically, a contract involving a loan must include the identity of the lender and borrower, the amount of the loan, and the terms for repayment in order to be sufficiently definite. [Citation.] Preliminary negotiations or agreements for future negotiations—so-called agreements to agree—are not enforceable contracts.' " (*Id.* at p. 583, quoting *Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1174.) Thus the cooperation agreement in *Grass Valley* was best understood as an umbrella agreement. (*Grass Valley,* at p. 583.)

"Grass Valley's umbrella agreement . . . 'permitted the City to "advance or expend" funds to the RDA or on its behalf, required periodic statements to the RDA of costs incurred by the City and required the RDA to use available funds to reimburse the City for all costs incurred. But the 1986 agreement did not reference any specific extant or anticipated projects, nor any "loan agreements" between the RDA and the City, as contemplated by section 34171, subdivision (d)(2).' (*Grass Valley, supra*, 17 Cal.App.5th at p. 583.) We held that the 1986 agreement was a ' "so-called agreement[] to agree . . . not [an] enforceable contract[]." ' (*Ibid.*; see *Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1174.) The '1986 agreement created a structure for how to treat future agreements, but was not a loan under any definition.' (*Grass Valley, supra*, 17 Cal.App.5th at p. 583.)" (*Brentwood II, supra*, 54 Cal.App.5th at p. 431.) Thus, the agreement to agree could not be reinstated as an enforceable agreement under the Dissolution Law.

18

## C.
### *Agreement to Agree is not a Loan*

Neither the cooperation agreement nor the funding agreement in this case constitute "loans" for which the section 34191.4 allows reinstatement. The 2004 cooperation agreement described the projects to be funded only by the broadest of brushes: "The City and the Agency have adopted *a number of redevelopment projects* within the City of Oakland pursuant to the California Community Redevelopment Law, *including* the Acorn, Broadway/MacArthur/San Pablo, Central City East, Central District, Coliseum, Oak Center, Oak Knoll, Oakland Army Base, Stanford/Adeline, and West Oakland Redevelopment Projects. The Agency has also established a Low and Moderate Income Housing Fund as required by the California Community Redevelopment Law." (Italics added.) No dollar amounts for each of these proposed projects were provided. And no third parties who might perform the work were identified. The cooperation agreement does not mention any repayment schedule. The 2004 cooperation agreement between the City and its former RDA was an agreement to agree, but not a loan.

Likewise, the 2011 funding agreement represented an agreement to agree rather than a loan. The 2011 funding agreement references the 2004 cooperation agreement. However, as we have explained above, the 2004 cooperation agreement did not provide any terms that are typical of a loan, but only set forth a framework for future cooperation between the City and its former RDA. In the funding agreement, the City agreed to assume responsibility for "all development and construction costs in connection with the Projects, including administration . . . ." One critical detail in a loan – the principal, or total indebtedness to be paid – is nowhere to be found. Instead, the funding agreement represents a wish list of items that the City and former RDA hoped to complete. The funding agreement refers to budgets for various projects rather than actual costs arising out of contracts with third parties. In addition to uncertainty about the total indebtedness, the funding agreement lacks specifics about repayment terms. Tellingly, the City would

19

eventually locate repayment terms in the subsequently enacted Resolution rather than in any provision in either the cooperation agreement or the funding agreement. Exhibit A to the Resolution is titled "Loan Repayment Schedule" and purports to describe "Loan Terms." The exhibit states that "[t]his loan *originated in 2008* and is payable over a three-year period commencing in 2014." (Italics added.) This reference to a 2008 loan is a mystery because it cannot refer to the cooperation agreement that was entered into in 2004 or the funding agreement that was entered into in 2011. In any event, the repayment terms are supplied for the first time in the Resolution. Regardless of whether the Resolution would have sufficed in itself in supplying all of the terms necessary to create a loan, the Dissolution Law allows only the *reinstatement* of "loan agreements entered into between the redevelopment agency and the city." (§ 34191.4, subd. (b)(1).) Subdivision (b)(2)(C)(i) further clarifies that this applies only to loans between the City and the former RDA. After the dissolution of the RDA's no new loans could be created as enforceable obligations under section 34191.4. Consequently, the repayment schedule in the exhibit to the Resolution does not imbue to the cooperation agreement or the funding agreement to retroactively supply a necessary component of what would be needed for a loan.

Thus, we agree with the trial court that the Resolution did not reinstate a loan because neither the cooperation agreement nor the funding agreement constitute loans within the meaning of the Dissolution Law.

### D.
### *Review of the Resolution on the ROPS*

Appellants contend that DOF lacked prerogative to disapprove of item 426 on the 2016-2017 ROPS because DOF failed to request a review of the Resolution when it had the chance to do so in 2013. Appellants rely on section 34179 to argue that the Resolution became effective after DOF expressly declined to review the Resolution in 2013. In pertinent part, subdivision (h) of section 34179 provides:

20

"(h)(1)  The department may review an oversight board action taken pursuant to this part.  . . . [¶]  . . . [¶]

"(2)  An oversight board action submitted in a manner specified by the department shall become effective five business days after submission, unless the department requests a review of the action.  Each oversight board shall designate an official to whom the department may make those requests and who shall provide the department with the telephone number and e-mail contact information for the purpose of communicating with the department pursuant to this subdivision.  Except as otherwise provided in this part, in the event that the department requests a review of a given oversight board action, it shall have 40 days from the date of its request to approve the oversight board action or return it to the oversight board for reconsideration and the oversight board action shall not be effective until approved by the department.  In the event that the department returns the oversight board action to the oversight board for reconsideration, the oversight board shall resubmit the modified action for department approval and the modified oversight board action shall not become effective until approved by the department.  *If the department reviews a Recognized Obligation Payment Schedule, the department may eliminate or modify any item on that schedule prior to its approval*."  (Italics added.)

Appellants reason that section 34179, subdivision (h)(2)'s provision that an action will "become effective" five days after DOF fails to request a review means that DOF is thereafter precluded from denying anything in that action by the Successor Agency.  We do not read "effective" in subdivision (h)(2) to mean "immune from further review" by DOF.  Although subdivision (h)(2) does not define "effective," it expressly contemplates that DOF reviews a ROPS subsequent to the oversight board's action – without imposing any qualifier relating to whether DOF may have previously reviewed or declined to review the original oversight board action.  Moreover, subdivision (h)(2) expressly provides DOF with authority to "eliminate or modify *any* item on that schedule prior to its approval."  (§ 34179, subd. (h)(2), italics added.)  Adopting appellants' view that

DOF's failure to initially review an oversight board resolution precludes further review would render subdivision (h)(2)'s authorization to deny *any* item on subsequent ROPS to be a mere nullity. "It is a maxim of statutory interpretation that courts should give meaning to every word of a statute and should avoid constructions that would render any word or provision surplusage." (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1038.) Instead, we conclude that the Legislature's express provision that DOF may eliminate or modify any item on a ROPS precludes a reading of subdivision (h)(2) that permanently cements a successor agency's action merely though failure to initially review a successor board's action.

The Legislature did provide a manner of cementing the determination that an item constitutes an enforceable obligation, but it did not do so in section 34179, subdivision (h)(2). Instead, the ability to conclusively determine that an item constitutes an enforceable obligation under the Dissolution Law may be found in section 34177.5, subdivision (i). Subdivision (i) provides: "If an enforceable obligation provides for an irrevocable commitment of revenue and where allocation of such revenues is expected to occur over time, *the successor agency may petition the department* by electronic means and in a manner of the department's choosing *to provide written confirmation that its determination of such enforceable obligation as approved in a Recognized Obligation Payment Schedule is final and conclusive*, and reflects the department's approval of subsequent payments made pursuant to the enforceable obligation. The successor agency shall provide a copy of the petition to the county auditor-controller at the same time it is submitted to the department. The department shall have 100 days from the date of the request for a final and conclusive determination to provide written confirmation of approval or denial of the request. For any pending final and conclusive determination requests submitted prior to June 30, 2015, the department shall have until December 31, 2015, to provide written confirmation of approval or denial of the request. *If the confirmation of approval is granted, then the department's review of such payments in*

*future Recognized Obligation Payment Schedules shall be limited to confirming that they are required by the prior enforceable obligation*." (§ 34177.5, subd. (i), italics added.)

Subdivision (i) of section 34177.5 provides for conclusive determination of an item as an enforceable obligation. Moreover, subdivision (i) shows that the Legislature expressly specifies how and when an enforceable obligation may not be denied in subsequent ROPS reviews. In contrast, subdivision (h)(2) of section 34179 allows for denials of items on ROPS reviews without regard for whether DOF previously reviewed or failed to review the underlying successor agency action that might have reinstated an enforceable obligation. Our conclusion follows this court's previous guidance in *Brentwood I*, *supra*, 237 Cal.App.4th 488.

In *Brentwood I*, this court noted the well-settled rule that "a party cannot assert estoppel against a government entity if it would nullify a strong rule of public policy." (*Brentwood I, supra*, 237 Cal.App.4th at p. 504.) This rule was applied to uphold DOF's decision denying certain items on a ROPS after DOF had allowed payment of these items on two previously submitted ROPS. (*Id.* at pp. 504-505.) As pertinent to this appeal, this court further noted that "[i]f [the City of] Brentwood had wanted an ironclad guarantee that approval of an enforceable obligation would be ongoing, it had the statutory remedy of petitioning the Department for a 'final and conclusive' determination of approval for subsequent payments for that enforceable obligation. (§ 34177.5, subd. (i).)" (*Id.* at p. 505.) The same result applies in this case, conclusive and final assurance that item 426 was an enforceable obligation lay in a petition under section 34177.5 rather than in failure of DOF to review the initial Successor Agency's Resolution under section 34179, subdivision (h)(2). Accordingly, we agree with the trial court that DOF had the prerogative to review and deny item 426 on the ROPS.

23

# III
## *Staffing Costs (Item 370)*

Appellants contend that DOF erred in denying the ROPS item corresponding to a request of staffing costs arising out of obligations of the Successor Agency to administer various unfinished housing projects. Appellants reason that that the "funds encumbered and amounts owed under those agreements transferred as assets to the City while the agreements themselves remained obligations of [the Successor Agency]." Like the trial court, we reject the proposition that the Dissolution Law allowed this splitting of the assets from the obligations arising under those agreements.

## A.
### *Dissolution Law Requirement to Transfer Housing Assets to the City*

Dissolving the former RDA's involved disposing of numerous types of assets and obligations. "Unwinding the redevelopment agencies' responsibilities to provide low- and moderate-income housing presented a unique challenge, one the Legislature gave the cities and counties the option to assume or not." (*City of Montclair v. Cohen* (2018) 20 Cal.App.5th 238, 245 (*City of Montclair*).) On this point, subdivision (a)(1) of section 34176 provides: "The city, county, or city and county that authorized the creation of a redevelopment agency may elect to retain the housing assets and functions previously performed by the redevelopment agency. If a city, county, or city and county elects to retain the authority to perform housing functions previously performed by a redevelopment agency, *all rights, powers, duties, obligations, and housing assets*, as defined in subdivision (e), excluding any amounts on deposit in the Low and Moderate Income Housing Fund and enforceable obligations retained by the successor agency, *shall be transferred to the city*, county, or city and county." (Italics added.)

Section 34176, subdivision (a)(2) provided the method by which the housing assets would be transferred by the successor agency and reviewed by DOF: "The housing successor shall submit to the Department of Finance by August 1, 2012, a list of

24

all housing assets that contains an explanation of how the assets meet the criteria specified in subdivision (e).  The Department of Finance shall prescribe the format for the submission of the list.  The list shall include assets transferred between February 1, 2012, and the date upon which the list is created.  The department shall have up to 30 days from the date of receipt of the list to object to any of the assets or transfers of assets identified on the list.  If the Department of Finance objects to assets on the list, the housing successor may request a meet and confer process within five business days of receiving the department objection.  If the transferred asset is deemed not to be a housing asset as defined in subdivision (e), it shall be returned to the successor agency.  If a housing asset has been previously pledged to pay for bonded indebtedness, the successor agency shall maintain control of the asset in order to pay for the bond debt."

The definition of "housing assets" to which subdivision (a)(2) of section 34176 refers encompasses more than physical housing structures.  Subdivision (e) provides that " 'housing asset' " includes "(1) Any real property, interest in, or restriction on the use of real property, whether improved or not, and any personal property provided in residences, including furniture and appliances, all housing-related files and loan documents, office supplies, software licenses, and mapping programs, that were acquired for low- and moderate-income housing purposes, either by purchase or through a loan, in whole or in part, with any source of funds," as well as "(2) Any funds that are encumbered by an enforceable obligation to build or acquire low- and moderate-income housing, as defined by the Community Redevelopment Law (Part 1 (commencing with Section 33000)) unless required in the bond covenants to be used for repayment purposes of the bond." (§ 34176, subd. (e).)

## B.
### *Transfer of Housing Assets to the City*

In August 2012, the City submitted a housing assets transfer form to DOF to reflect a transfer of housing assets from the Successor Agency to the City.  Subsequently,

25

the City submitted ROPS III for January through June 2013 that included item 370 for staffing costs of $849,314. DOF initially denied item 370 because "[i]t was unclear why staff would be working on a project for which the [Successor] Agency was not requesting funding." A meet and confer process provided additional information that resulted in DOF approving the staffing costs. DOF then approved item 370 on several subsequent ROPS.

DOF, however, denied item 370 on the 2018-2019 ROPS. In rejecting the item on the 2018-2019 ROPS, DOF explained: "It is our understanding that these [staffing] costs are related to housing obligations approved for transfer on the Housing Asset Transfer (HAT) form (i.e., real property, encumbrances, and/or loan receivables) to the Housing Successor Entity. Pursuant to . . . section 34176[, subdivision ](a)(1), the [Successor] Agency may retain enforceable obligations related to housing assets transferred to the Housing Successor Entity. However, there are no contractual agreements obligating the Agency to perform project management on these housing assets. Therefore, because the housing assets have been transferred, related project management costs are the obligation of the Housing Successor Entity, not the Agency."

The trial court agreed with DOF's denial of item 370 and found: "When it assumed [the RDA's] housing functions and submitted its housing asset list to DOF in 2012, the City identified several assets associated with certain preexisting, written loan agreements in which [the RDA] had been the lender. The loan agreements were executed between 2000 and 2004. Under these agreements, [the RDA] promised to provide loans to borrowers seeking to acquire affordable housing sites. The agreements contemplate ongoing lender monitoring of borrower activities. Provisions in the agreements, for example, require the borrowers to submit various documents for lender review. There are other 'project management' duties that the lender must perform as well. [¶] Although the properties acquired under the loan agreements are listed on the City's housing asset

26

list, [the Successor Agency] purports to retain the lender-monitoring and other project-management duties under the agreements." (Fn. omitted.)

"Given that the City acquired significant assets inherent in the loan agreements—including the right to receive loan repayments—[the Successor Agency] could not have retained the full loan agreements after DOF approved the City's housing asset list. . . . [¶] The court concludes that [section] 34176[, subdivision ](a)(1) did not authorize [the Successor Agency] to retain as its own enforceable obligations loan agreements whose benefits were transferred to the City. As a result, [the Successor Agency] was not entitled to property tax revenues to pay staff performing project management under these agreements. [¶] The fact that DOF approved Item 370 more than once before denying it on [the Successor Agency's] ROPS 18-19 is irrelevant. The strong public policy of providing taxing authorities with RDA['s] former tax increment revenues authorizes DOF to reconsider its prior ROPS determinations. (See *City of Galt* [*v. Cohen* (2017) 12 Cal.App.5th 367,] 385.)"

The trial court further reasoned that "Section 34176, subd[ivision] (a)(2) also undermines [the City's] notion that a successor agency may possess housing assets for an extended period after the assets have been approved for transfer to a different entity. That subdivision imposed a deadline of [August 1, 2012,] for housing successors to submit their acquired housing asset lists to DOF, followed by 30 days in which DOF could object. Why set these deadlines if the Legislature intended for successor agencies to hold the assets only to transfer them to housing successors at any time in the future?"

### C.
### *Unity of Assets and Obligations*

Under the Dissolution Law, the staffing costs in item 370 transferred to the City along with the transfer of the cooperation and funding agreements to the City. Section 34176, subdivision (a)(1) allows the City to retain "the housing assets *and functions* previously performed by the redevelopment agency." (§ 34176, subd (a)(1), italics

27

added.)  Subdivision (a)(1) expressly disallows the splitting of the housing assets from their related obligations.  Subdivision (a)(1) plainly states that "all rights, powers, duties, obligations, and housing assets . . . *shall* be transferred to the city . . . ."  (*Ibid*.) Administrative duties required under the cooperation and funding agreements were therefore transferred to the City as a matter of statutory mandate under section 34176, subdivision (a)(1).

Appellants argue that "the housing related agreements are enforceable obligations and were therefore retained by [the Successor Agency]."  In so arguing, appellants acknowledge that "[b]oth DOF and the trial court are correct that assets related to the Housing Related Agreements were transferred to the City."  But appellants protest that requiring the City to assume contractual obligations of the Successor Agency would unconstitutionally impair the rights of the third parties under those contracts.  We disagree.  Denying repayment of the Successor Agency's staffing costs on a ROPS does not substitute the parties to a contract.  There is a fundamental difference between impairing a contract between parties and seeking funding from another source for administrative costs incurred by the Successor Agency.

Appellants point out that the Successor Agency has continued to diligently pursue the completion of the agreements that were transferred.  As appellants point out, "once complete, no more staffing costs will be required . . . ."  Thus, appellants reason that continued payment of staffing costs aligns with the Dissolution Law's intent to wind down the affairs of the former RDA's.

In *City of Montclair*, this court noted that the housing authorities presented compelling policy reasons for why they should be compensated their administrative costs. (*City of Montclair, supra*, 20 Cal.App.5th at p. 250.)  These policy reasons included the fact that the housing authorities "did not volunteer for the job" of assuming additional housing functions, that the responsibilities were "enormous and expensive," and that housing authorities are chronically underfunded.  (*Ibid.*)  Even so, we noted the well-

28

settled rule that the prerogative to set public policy belongs to the Legislature. (*Id.* at p. 256.) *City of Montclair* held that "[t]he Legislature determined that cities and counties should not recoup the cost of their administrative expenses if they elect to assume the housing functions of their former redevelopment agencies pursuant to section 34176." (*Id.* at p. 253.) We hew to that conclusion.

We conclude that the City lacked the ability to separate the housing assets from their staffing obligations based on the language of section 34176, subdivision (a)(1) that prevents the separation of assets and obligations between the City and its Successor Agency.[5] Thus, the Successor Agency, by law, is not entitled to claim its staffing costs related to housing assets that had been previously transferred to the City.

## DISPOSITION

The judgment is affirmed. The Department of Finance shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


                                               _____

                                               HOCH, J.


We concur:


_____

HULL, Acting P. J.


_____

KRAUSE, J.


---

[5]     Given our conclusion, we do not need to resolve the scope of the cooperation and funding agreements. The terms of these agreements cannot supersede the statutory scheme comprising the Dissolution Law.

Filed 6/1/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF OAKLAND et al., | C090832 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2018-80003024-CU-WM-GDS) |
| v. | |
| DEPARTMENT OF FINANCE et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

APPEAL from a judgment of the Superior Court of Sacramento County, James P. Arguelles, Judge.  Affirmed.

Burke, Williams & Sorensen, J. Leah Castella and Megan A. Burke for Plaintiffs and Appellants.

Rob Bonta, Attorney General, Thomas S. Patterson, Assistant Attorney General, Mark R. Beckington, Lara Haddad and Jerry T. Yen, Deputy Attorneys General, for Defendants and Respondents.

THE COURT:

The opinion in the above-entitled matter filed on May 6, 2022, and modified on May 31, 2022, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports and it is so

1

ordered.

FOR THE COURT:


  /s/
HULL, Acting P. J.


  /s/
HOCH, J.


  /s/
KRAUSE, J.